Filed 4/14/25  P. v. Samuels CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WILLIE SAMUELS, <br><br> Defendant and Appellant. | A169574 <br><br> (Alameda County Super. Ct. No. 20CR015549B) |

Defendant Willie Samuels appeals a judgment convicting him of, among other charges, voluntary manslaughter, illegal possession of a firearm by a felon, and illegally carrying a loaded firearm in an incorporated city, and sentencing him to an aggregate term of 28 years, 4 months in prison.  He contends that:  (1) the trial court committed prejudicial error by admitting evidence suggesting he was a pimp; (2) his firearm convictions violate the Second Amendment; (3) no substantial evidence was admitted to establish that the shooting occurred in an incorporated part of the City of Oakland; and (4) the great bodily injury enhancement attached to his manslaughter conviction is invalid.  We agree that the great bodily injury enhancement should be stricken but affirm the judgment in all other respects.

## BACKGROUND

In July 2022, Samuels was charged with murder (Pen. Code,[1] § 187, subd. (a); count 1); shooting at an occupied motor vehicle (§ 246; count 2); possession of a firearm by a felon (§ 29800, subd (a)(1); count 3); and carrying a loaded firearm in an incorporated city (§ 25850, subd. (a); count 4). The information alleged enhancements under counts 1 and 2 for personally inflicting great bodily injury during the commission of a felony (§ 12022.7, subd (a)) and personally discharging a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). The information also alleged several circumstances in aggravation (Cal. Rules of Court, rule 4.421) and that Samuels had suffered a prior strike conviction.

The following evidence was presented at trial.

Samuels and the victim met in 2020 and immediately started dating. As set forth in greater detail below, a friend of the victim testified that she believed the victim started working as a prostitute shortly after she started dating Samuels and that she believed Samuels was a pimp.

Fernando Sevilla was charged and tried as Samuel's co-defendant. He testified at trial that in the early morning of November 6, 2020, as he was driving on International Boulevard, a woman—the victim in this case—called out to him and approached his car at a traffic light. The woman offered to engage in a sex act for money. They discussed the price that she

---

[1] All undesignated statutory references are to the Penal Code.

2

would charge but did not agree to any particular sexual act. The woman then got into the truck and directed Sevilla to drive to San Antonio Park. On the way to the park, the woman was texting someone constantly. Other testimony established that she was texting Samuels. According to Sevilla, he and the woman agreed to a price of $200 for a sex act of an undetermined type, but when he removed his money from his pocket, the woman took out a gun, pointed it at him, and demanded he give her all his money. Sevilla estimated that they were parked for a minute or two before the victim pulled out her gun and asked for money. After Sevilla complied, the woman got out of his truck, ran across the street, and got inside a car that was parked with the lights off.

Sevilla made a three-point turn, pulled up next to the car, and turned on his headlights. When he pulled alongside the car, he confronted the driver, who he saw had a large gun in his hand. The driver of the other car pointed his gun at Sevilla and fired the gun. Sevilla felt two bullets go past his head and the glass of the truck's window rained down on him. Sevilla grabbed his .45 caliber semiautomatic handgun and fired two bullets at the driver of the car in response, then drove away.

Through surveillance video, officers identified Samuels as the driver of the car to which the victim ran after leaving Sevilla's truck. Although the surveillance videos did not capture what happened inside the two vehicles and there was a dispute at trial as to who fired first, the videos generally depicted the actions of the defendants and the victim consistent with Sevilla's

3

testimony. The videos also showed that a little over two minutes passed between the time that the victim exited Sevilla's car and Sevilla's car pulled up next to Samuel's car.

One of the bullets from Sevilla's gun hit the victim in her head. Samuels drove the victim to Highland Hospital where she later died. A witness testified that Samuels approached his truck at the bottom of the driveway to the emergency room holding the victim in his arms and asking for help. After they placed the victim in the truck bed, Samuels "turned around and ran and left me with her."

Before closing argument, Samuels admitted the prior strike allegation.

The jury found Samuels not guilty of murder but guilty of voluntary manslaughter and guilty of the remaining charges. It also found the great bodily injury and firearm enhancements true.[2]

Samuels was sentenced to an aggregate term of 28 years, 4 months in prison.

---

[2] The jury found Sevilla guilty of voluntary manslaughter with various enhancements, shooting at an occupied motor vehicle with various enhancements and carrying a loaded firearm in a city. His appeal is pending separately. Samuels' request that this court take judicial notice of the record in Sevilla's appeal is granted.

DISCUSSION

## I.

## A.

Prior to trial, the court heard three in limine motions regarding the admissibility of evidence that the victim was a prostitute and Samuels was a pimp. First, Samuels moved to exclude all evidence that he was a pimp on the grounds that the evidence was irrelevant, inadmissible under Evidence Code section 1101, subdivision (a), and should be excluded under Evidence Code section 352. His motion identified some of the objectionable evidence as "hearsay statements made by the deceased victim to her family members, as well as financial records and social media records linking them" and evidence regarding "an incident in which defendant was shot by the family of a young woman whom defendant was alleged to have attempted to secure as a prostitute." At the same time, Sevilla moved to admit evidence that the victim engaged in prostitution, and also to admit the victim's statements to others that Samuels was a pimp. Sevilla argued, "The statements to others reflects the decedent's state of mind, to prove the reason why she knew to have the codefendant meet her and assist her in this encounter that started as an act of prostitution but turned into a robbery." Finally, the prosecutor moved to exclude evidence that that the victim was a prostitute, although the prosecutor acknowledged that "the people cannot preclude Defendant Sevilla from testifying that he was a customer that evening, that he was robbed, that there were acts of prostitution."

Following a hearing, the trial court ruled that evidence suggesting that Samuels was a pimp and that the victim had engaged in prostitution would be admissible at trial. With respect to the admission of evidence that the victim may have been involved in prostitution, the court explained, "I think this evidence is significant in the sense that, first off it would, from the Court's perspective, provide the trier of fact with some context as to how and why these three folks' lives are now forever intertwined. [¶] . . . [¶] . . . [This case] ain't a whodunit. This is a what-is-it. And I mention that because this evidence I do feel could directly and significantly relate to the people's theory of the case and certainly to any potential defenses that I understand are going to be raised at trial. I think this evidence would go a long way in explaining the initial meeting between the complaining witness and Mr. Sevilla. It would explain the initial meeting between Mr. Sevilla and Mr. Samuels and their subsequent—I don't know what you want to call it—dispute, argument, conflict, disagreement, whatever it's going to turn out to be. And I think it helps to explain why this interaction occurred at all and why everybody acted as they did." The court found further that the victim's statements to others "with respect to her understanding of [Samuels's] role in prostitution [is] also . . . relevant, not for the truth of those statements, but rather, I think from the Court's perspective, to explain her conduct on November 6th after leaving Mr. Sevilla's truck." The court added, "I think testimony and evidence as it relates to that could very well explain for the trier of fact why she went to Mr.

Samuels's vehicle . . . rather than anywhere else.  That could be explained.  [¶]  It would help shed light on whether or not she did in fact go there of her own volition or because she had no choice in the matter, and it may very well be circumstantial evidence of [Samuels's] knowledge of the complaining witness's actions when she met up with Mr. Sevilla."

**B.**

At trial, consistent with the court's ruling, the victim's best friend testified that after the victim started dating Samuels, she stopped spending time with her old friends and spent all her time with Samuels in parts of East Oakland that were known for prostitution.  The witness explained that she was concerned the victim was involved in prostitution and, on a couple of occasions, she asked her about it.  Although the victim denied that she was engaging in prostitution, based on the victim's responses, the witness did not believe her.  The witness testified that she had never spoken to Samuels about prostitution, but that on one occasion he told the witness that she could come to his "team."  The witness did not "know what he meant" by "my team," but she assumed that it meant engaging in prostitution.  When the witness was asked whether she told a defense investigator that Samuels tried to convince her to do sex work for him, she responded that she "didn't say that" and clarified that she said she did not "know what the situation was but that's what [she] was feeling like."  She explained that his use of the word "team" made her think Samuels was talking about prostitution.

On cross-examination by Sevilla's attorney, the witness testified that the victim told the witness that Samuels had a "team" of "females" who were "making money" for him. When the witness testified that the victim never used the word "pimp" in describing Samuels, she was asked to refresh her memory by reviewing the report prepared by an investigator following his interview with the witness. After reading the report, the witness acknowledged telling the investigator that the victim told her that Samuels was a pimp, but explained that her statement to the investigator was based on her understanding or interpretation of the victim's statement that Samuels had women working for him.

Other evidence admitted at trial also suggested that Samuels was a pimp. A different friend of the victim testified that, after the victim started spending time with Samuels, the victim's demeanor changed. She was "distant," "not as vibrant," and "she seemed scared almost." The victim posted photos and videos on her social media account that depicted Samuels and her with "stacks of money" and a picture that depicted two handguns with the words, "his and hers." In addition, a police detective testified that, four days prior to the shooting, the victim took Samuels to the hospital for treatment after he was shot at a motel known for prostitution activity, where the victim had rented a room.

## C.

On appeal, Samuels argues that the trial court erred in admitting evidence that suggested he was a pimp. The Attorney

8

General argues that Samuels forfeited this argument by failing to object when the matter was raised at trial. Alternatively, the Attorney General argues that the trial court did not abuse its discretion in admitting the evidence and that any possible error was harmless.

Initially, we reject the Attorney General's argument that Samuels forfeited this argument by failing to object in the trial court. "The general rule is that 'when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal.' " (*People v. Brown* (2003) 31 Cal. 4th 518, 547.) Despite this general rule, "a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim." (*Ibid.*; see *People v. Morris* (1991) 53 Cal.3d 152, 189, overruled on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 ["a specific objection to a particular body of evidence" advanced and ruled upon definitively on a motion in limine can preserve the issue for appeal].)

Here, the record demonstrates that the trial court made a sufficiently definite and express ruling as to the admissibility of the victim's statement in response to the motions in limine and that thereafter, contrary to the Attorney General's characterization, counsel repeatedly asserted hearsay objections to the witness's testimony regarding the victim's statements. Accordingly, Samuels's challenge to the admissibility of the victim's statement was properly preserved.

9

The record is less clear, however, that Samuels has preserved for appeal his challenge to any other evidence introduced at trial suggesting that Samuels was a pimp, such as the friend's descriptions of the victim's social media posts. While Samuels's motion in limine specifically sought to exclude all evidence that he was a pimp on the grounds that the evidence was irrelevant and inadmissible under Evidence Code sections 1101, subdivision (a), and 352 and his counsel reasserted those arguments at the hearing on the motions, the trial court did not expressly rule on the admissibility of any evidence other than the victim's statements. As the Attorney General notes, Samuels's own statements suggesting that he was a pimp were introduced at trial without objection. Shortly thereafter, however, while discussing his hearsay objection to the victim's statement, Samuels's counsel clarified his understanding of the court's in limine ruling: "My understanding is the Court's in limine ruling had to do with relevance, and that if [Sevilla's counsel] or [the prosecutor] could elicit valid testimony that was not in violation of, for example, the hearsay rule, then that was a proper subject." On this record, we decline to find that Samuels has forfeited the argument, asserted in his in limine motion, that evidence offered to prove that he was a pimp was generally irrelevant and inadmissible under Evidence Code sections 1101 and 352.

## D.

Samuels argues that the evidence offered to prove that he was a pimp was inadmissible character evidence, violated the

10

hearsay rule, and should have been excluded under Evidence Code section 352. Evidence Code section 1101, subdivision (a) states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Hearsay evidence, defined by statute as an out-of-court statement that is offered to prove the truth of the matter asserted, is also generally inadmissible except as provided by law. (Evid. Code § 1200, subd. (a), (b).) Finally, evidence that is not inadmissible under Evidence Code section 1101, subdivision (a), or the hearsay rule may be excluded nonetheless under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We find it unnecessary to decide whether the court erred in admitting evidence suggesting that Samuels was a pimp because we conclude that any such error was harmless. Contrary to Samuels's argument, the alleged improper admission of the evidence did not violate his Fourteenth Amendment right to due process. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence . . . results in a due process violation only if it makes the trial fundamentally unfair" (italics omitted)].) Accordingly, we apply the prejudice standard applicable to state law error (*People v. Watson* (1956) 46 Cal.2d 818, 836), not the

standard for constitutional error (*Chapman v California* (1967) 386 U.S. 18, 24), in evaluating whether reversal is required. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232 [only on "rare and unusual occasions" can admission of evidence result in an error of such magnitude so as to raise federal due process concerns and trigger *Chapman* review].)

Samuels contends that "[t]here is a reasonable chance that if the jurors had not heard that appellant was a pimp, they would have declined to convict appellant of any homicide offense or of shooting at an occupied motor vehicle . . . because the jurors would have been more likely to find that appellant acted in reasonable self-defense." He explains: "The jurors were likely to conclude from the evidence suggesting that appellant was a pimp that he was in the area where the shooting occurred for a nefarious purpose, such as prostitution or robbing 'johns.' If that was the case, appellant presumably would have been ready and willing to use his gun for the accomplishment of those purposes and not merely for self-defense." We are not persuaded.

First, even without the additional suggestive evidence identified in the motion in limine, we agree with the Attorney General that "the jury would be able to infer that Samuels was there to manage [the victim's] encounter with Sevilla." There was considerable evidence that the victim was engaged in prostitution, including Sevilla's own testimony, which the prosecutor agreed could not be excluded. Samuels himself did not object to the evidence of prostitution. Other evidence showed that Samuels was the victim's boyfriend, whether or not he was

12

also her pimp. And the evidence further showed that the victim was texting with Samuels while she was in Sevilla's truck, and that upon leaving she went directly to Samuels's car, where he had been waiting, armed. Given the direct and circumstantial evidence of the nature of Sevilla's encounter with the victim and her communications with Samuels throughout, we think the jury would have developed a similar understanding of Samuels's role during the events in question even if the trial court had granted his motion in limine.

Second, even if the jury did not draw the specific inference from this other evidence that Samuels was the victim's pimp, we see no reasonable probability that it would have made a different assessment of whether he was acting in self-defense when he exchanged gunfire with Sevilla. In closing argument, the prosecutor did not suggest that it made any difference whether Samuels was only the victim's boyfriend or also her pimp: "They're working as girlfriend-boyfriend, pimp-prostitute, however you want to say it." Sevilla's counsel also did not place significant emphasis on the distinction in closing: "And there's this understanding based on the evidence in this case that the relationship between Ms. Sandoval and Mr. Samuels is this pimp-prostitution dynamic, even a boyfriend-girlfriend thing as well." Moreover, he argued that the evidence was relevant only "to give you some context and understanding as to why the two of them are together that night and working together that night and why they're interacting with Mr. Sevilla." As the Attorney General adds, "[a]ny prejudicial harm was also reduced by the

fact that the parties told the jury that no one was charged with pimping or pandering, and it should not use such evidence to evaluate Samuels's character." For example, Sevilla's counsel told the jury that he was not judging or criticizing Samuels for being a pimp. During rebuttal, the prosecutor reminded the jury, "[N]obody is charged with prostitution. Nobody is charged with human trafficking. Nobody is charged with any of that. [¶] If I were to belabor that point, I would be ignoring my duty. I would not be following the law. And I would be engaging in smoke screens and distractions that are unnecessary to this inquiry."

The parties' arguments were focused elsewhere. The sequence of events—including the two minutes the victim spent in Sevilla's truck and the similar amount of time she was in Samuels's car before Sevilla pulled up and the defendants exchanged fire—was captured in a video shown to the jury, with testimony about the video and about audio captured by the city's ShotSpotter system. The prosecutor argued that this evidence, along with the fact that both men had guns "at the ready," showed that the defendants were engaged in mutual combat, and she pointed to conduct by both defendants after the shooting that undermined a claim of self-defense by either of them, including false statements Sevilla made to various people and Samuels's flight from the hospital. Sevilla's counsel focused on the audiovisual and forensic evidence that Samuels shot first and more times overall, and to a lesser extent on his client's testimony that the victim had robbed him after agreeing on a price for a sex act. Likewise focusing on the audiovisual

14

evidence, Samuels's counsel responded by arguing that Samuels saw Sevilla with the gun before Samuels fired, so he acted in self-defense even if the jury were to conclude that he was the first to shoot. He also sought to cast doubt on Sevilla's testimony that the victim robbed him, pointing out, for example, that Samuels did not drive away when she got in the car, and to other evidence suggesting that Sevilla was the aggressor.

The jury found that neither defendant had justifiably acted in self-defense, but also that neither one possessed the mental state required for murder. None of the parties' arguments on these critical questions turned on the precise nature of the relationship between Samuels and the victim. Again, even without the pieces of evidence that Samuels sought to exclude, other evidence showed that he knew the victim was engaged in prostitution, that he arrived armed and was there to assist her, that he was communicating with her while she was in Sevilla's truck, that he had time with her in the car before Sevilla drove up, and that he fled from the hospital after leaving her in the bed of a pickup truck. Particularly in light of the parties' arguments and their focus on the audiovisual evidence, we see no reasonable probability that the jury would have found that Samuels acted in self-defense if the trial court had excluded the other evidence suggesting more directly that he was a pimp.

## II.

Samuels contends that his conviction under section 29800, subdivision (a), for unlawful possession of a firearm by a person with a felony conviction violates the Second Amendment of the

15

United States Constitution.  He acknowledges that California courts have consistently rejected Second Amendment challenges to section 29800, subdivision (a), on the theory that only law-abiding citizens are protected by the Second Amendment.  (See *People v. Odell* (2023) 92 Cal.App.5th 307, 316–317; *People v. Alexander* (2023) 91 Cal.App.5th 469, 478–479; *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1299–1301.)  These case rely on *District of Columbia v. Heller* (2008) 554 U.S. 570, 626–627, in which the court observed that that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" and *McDonald v. City of Chicago* (2010) 561 U.S. 742, 786, in which the court reiterated that nothing in its decision should cast doubt on laws prohibiting, among other things, " 'the possession of firearms by felons and the mentally ill.' "

In his opening brief, Samuels relied on *United States v. Duarte* (9th Cir. 2024) 101 F.4th 657 to argue that these California Court of Appeal decisions have been wrongly decided and that reliance on the above quoted language in *Heller* and *McDonald* is misplaced.  In his reply, he concedes that the Ninth Circuit decision was vacated and ordered reheard en banc. (*United States v. Duarte* (9th Cir. 2024) 108 F.4th 786.)

In *People v. Richardson* (2025) 108 Cal.App.5th 1203, 1207 (*Richardson*), the court held that a defendant's "convictions for

16

being a felon in possession of a firearm and ammunition are constitutional because only law-abiding citizens are among the class of people covered by the text of the Second Amendment." The court rejected the defendant's argument that the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1 altered the prior California and Supreme Court precedent on this issue. The court explained that in *Bruen* the court found New York's concealed carry law unconstitutional "because the law impermissibly prevented 'law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.' " (*Richardson,* at p. 1210.) The *Richardson* court observed that in *Bruen,* the court expressly acknowledged that its decision was consistent with *Heller* and *McDonald* and emphasized that the petitioners in that case "were 'law-abiding' citizens and, as such, 'part of "the people" whom the Second Amendment protects.' " (*Ibid*.)

The *Richardson* court also rejected the defendant's reliance on the Ninth Circuit's decision *United States v. Duarte* (9th Cir. 2024) 101 F.4th 657. The court wrote that, as we noted above, "the Ninth Circuit granted rehearing en banc in that case, and the decision in *Duarte* has since been vacated" but also explained that "even assuming *Duarte* remains good law, we are not bound by decisions of the Ninth Circuit [citation], and we find more persuasive the California authority discussed above upholding the constitutionality of sections 29800, subdivision (a)(1), and 30305, subdivision (a)(1)." (*Richardson, supra,* 108 Cal.App.5th at p. 1213.)

17

Finally, we note that it is not necessary to exclude felons from the class of people "protected by the Second Amendment" because, as the court concluded in *People v. Anderson* (2024) 104 Cal.App.5th 577, the law that prohibits defendant's possession of a firearm is " 'consistent with the principles that underpin' the nation's historical tradition of firearm regulation." (*Id.* at pp. 588–589.)  In that case, after conducting an exhaustive analysis of historic firearm legislation, the court found that "historical evidence shows that individuals were disarmed as a preventative measure when the law assessed they were unwilling to respect sovereign authority, *and* they were disarmed as a sanction for criminal conduct, whether or not involving physical violence."  (*Id.* at pp. 598–600.)  On that record, the court had "no trouble concluding that in the founding era, [defendant] could have been disarmed as punishment for at least one of [his] crimes" where defendant had been convicted for several crimes involving moral turpitude including maliciously and intentionally shooting at an inhabited dwelling or motor vehicle (§ 246) and assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)).  (*People v. Anderson, supra*, 104 Cal.App.5th at p. 600.)  Here, Samuels has made no attempt to challenge the court's analysis in *Anderson*, and as in that case, we too would have no trouble concluding that in the founding era, he could have been disarmed as punishment for his prior conviction for home invasion robbery in concert (§ 211; 212.5, subd. (a)).  Accordingly, we affirm Samuels's conviction under section 29800, subdivision (a).

## III.

Under section 25850, subdivision (a), "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city, city and county, or in any public place or on any public street in a prohibited area of an unincorporated area of a county or city and county."

As with his other firearm conviction, Samuels contends that his conviction on this count violates the Second Amendment. He acknowledges that his "analysis concerning the felon-in-possession statute, requiring the People to justify that law with a historical analogue, is largely the same as it is for the law criminalizing the carrying of a loaded firearm in an incorporated city. Carrying a loaded firearm is a form of firearm possession. Therefore, both statutes proscribe a form of firearm possession. If the felon-in-possession statute cannot survive the *Bruen* test, then the law criminalizing the carrying of a loaded firearm in an incorporated city also cannot survive that test." Because Samuels fails to differentiate his argument on this count from his argument regarding section 29800, subdivision (a) and we have rejected his argument with regard to the illegal possession charge, this claim fails as well.

Samuels's argument that there was insufficient evidence that the shooting took place in a part of Oakland that was incorporated fares no better. At trial, when discussing the instructions with the parties, the court indicted that it would instruct the jury with CALCRIM No. 2530, including that "I will

19

add Oakland as the incorporated city." Defense counsel did not object. Then, the court instructed the jury pursuant to CALCRIM No. 2530 as follows: "The defendants are charged in Count Four with unlawfully carrying a loaded firearm on his person in violation of Penal Code section 25850(a). [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant carried a loaded firearm on his person; [¶] 2. The defendant knew that he was carrying a firearm; [¶] AND [¶] 3. At that time, the defendant was in a public place or on a public street in an incorporated city. [¶] . . . Oakland is an incorporated city. . . ."

On appeal, Samuels does not dispute that Oakland is an incorporated city or that the court should have taken judicial notice of that fact. He argues, however, that the court did not take judicial notice of the fact and as such, the court improperly usurped the jury's fact-finding function by instructing the jury that Oakland was an incorporated city. Accordingly, what Samuels asserts is not a deficiency in proof but rather an instructional error. For the reasons discussed below, any error in that regard was harmless.

Our determination of this issue is governed by *People v. Flood* (1998) 18 Cal.4th 470 (*Flood*). In *Flood*, the defendant was found guilty of the offense of evading a vehicle operated by a pursuing peace officer resulting in serious bodily injury. There was undisputed evidence that the individuals in the vehicle "were employed as police officers by the City of Richmond." (*Id.* at p. 490.) In its instruction, however, the trial court did not inform

the jurors that they must determine whether the persons in the pursuing motor vehicle were peace officers, an essential element of the crime, nor did it provide them with the statutory definition of "peace officer"; instead, the court "informed the jury—in conformity with the uncontradicted evidence that had been presented at trial—that the police officers in that vehicle were peace officers, thus effectively removing this element of the crime from the jury's consideration." (*Id*. at p. 475.) The court found the error harmless beyond a reasonable doubt. (*Id*. at p. 507.) The court explained that "reversing defendant's conviction because of an instructional error concerning an uncontested, peripheral element of the offense, which effectively was conceded by defendant, was established by overwhelming, undisputed evidence in the record, and had nothing to do with defendant's own actions or mental state, would erode the purpose and rationale of the harmless error doctrine and promote disrespect for the judicial system." (*Ibid.*)

Here, as Samuels concedes, the undisputed evidence showed that the shooting occurred in Oakland. The fact that Oakland is an incorporated city is both undisputed in this case and subject to mandatory judicial notice. (Evid. Code, § 451, subd. (a) ["Judicial notice shall be taken of . . . [t]he decisional, constitutional, and public statutory law of this state and of the United States and the provisions of any charter described in Section 3, 4, or 5 of Article XI of the California Constitution"]; Gov. Code, § 57380 ["Courts shall take judicial notice of the organization and existence of the cities incorporated pursuant to

21

this division"].)  While the trial court erred by failing to make the conclusion compelled by the proof, i.e., to take mandatory judicial notice before informing the jury, we can say, beyond a reasonable doubt, that the error complained of did not contribute to the verdict obtained.  (*Flood, supra,* 18 Cal.4th at pp. 504–507.)

## IV.

Samuels argues that the great bodily injury finding under section 12022.7, subdivision (a), on count 1 must be reversed because it is unauthorized.  Respondent agrees that the enhancement is unauthorized under section 12022.7, subdivision (g), which provides, "This section shall not apply to murder or manslaughter."  We agree and direct the trial court to set aside the enhancement and the sentence imposed thereon.

## DISPOSITION

The great bodily injury enhancement (§ 12022.7, subd. (a)) is stricken from count 1.  The judgment is affirmed in all other respects.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
SIGGINS, J. *

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.